O:\LAWCLK1\03\03-2551-SJ's-FINAL.wpd

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**ROYAL WHITAKER III and**
**SUSAN WHITAKER,**

    **Plaintiffs,**

             **CIVIL ACTION**
  **vs.**           **No. 03-2551-GTV**

**TRANS UNION CORPORATION,**
**EXPERIAN INFORMATION**
**SOLUTIONS, INC., and**
**CSC CREDIT SERVICES, INC.,**

    **Defendants.**

### ORDER

*Pro se* Plaintiffs Royal Whitaker III and Susan Whitaker bring this action pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq., alleging that Defendants Trans Union Corporation ("Trans Union"), Experian Information Solutions, Inc. ("Experian"), and CSC Credit Services, Inc. ("CSC Credit")[1] reported inaccurate information on Plaintiffs' credit files and failed to remove such information after receiving adequate notice.[2]  Specifically, Plaintiffs allege that Defendants violated: 15 U.S.C. § 1681e(b) by not following reasonable procedures to

---

[1]  On May 5, 2004, the court dismissed Defendant CSC Credit with prejudice after being informed that Plaintiffs and CSC Credit had settled their disputes.

[2]  The court has subject matter jurisdiction pursuant to 15 U.S.C. § 1681p and 28 U.S.C. §§ 1331, 1332.

assure the accuracy of the information in their credit reports; 15 U.S.C. §§ 1681i(a) and 1681s-2(b) by not properly investigating and resolving disputed information; and 15 U.S.C. § 1681g by not clearly and accurately disclosing the nature and substance of all information in their credit files.   Pursuant to 15 U.S.C. § 1681n, Plaintiffs also request punitive damages for Defendants' willful noncompliance with the FCRA.

This action is before the court on Plaintiffs' motion for summary judgment (Doc. 67), Trans Union's motion for summary judgment (Doc. 193), and Experian's motion for summary judgment (Doc. 188).   For the following reasons, Trans Union's and Experian's motions for summary judgment are granted and Plaintiffs' motion for summary judgment is denied as moot.

## I. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   Lack of a genuine issue of material fact means that the evidence is such that no reasonable jury could return a verdict for the nonmoving party.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.   This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case.   Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).   Once the moving

2

party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.   <u>Anderson</u>, 477 U.S. at 256.   "[A] party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."   <u>Id.</u>   Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. <u>Id.</u>   The court must consider the record in the light most favorable to the nonmoving party.   <u>Bee v. Greaves</u>, 744 F.2d 1387, 1396 (10th Cir. 1984).

"A pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers."   <u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991) (citations omitted).   Nevertheless, a district court is not "to assume the role of advocate for the pro se litigant."   <u>Id.</u>   "[T]he court will not construct arguments or theories for the plaintiff in the absence of any discussion of those issues."   <u>Drake v. Ft. Collins</u>, 927 F.2d 1156, 1159 (10th Cir. 1991) (citations omitted).   Moreover, a *pro se* litigant's status does not excuse a failure to adhere to the requirements of the Federal Rules of Civil Procedure, <u>Ogden v. San Juan County</u>, 32 F.3d 452, 455 (10th Cir. 1994) (citation omitted), or to the district court's local rules, <u>Green v. Dorrell</u>, 969 F.2d 915, 917 (10th Cir. 1992).

In this case, Plaintiffs have disregarded District of Kansas Rule 56.1's guidance on filing and responding to motions for summary judgment.   Plaintiffs' motion for summary judgment consists of a two-and-a-half page "Introduction" providing a narrative version of their claims and a one page argument section.   Plaintiffs' memorandum fails to provide a list of material facts or

any citation to the record.   Instead, Plaintiffs attached a three-and-a-half page affidavit that sets forth thirty-four numbered statements along with a tabbed packet containing twenty-six "exhibits." The exhibits contain an index briefly explaining their content, but nowhere in Plaintiffs' memorandum or affidavit do Plaintiffs cite to the exhibits.   Plaintiffs also filed a reply brief to Experian's and Trans Union's responses.   This reply contains a narrative version of their case interspersed with several conclusory statements, identifies the specific sections of the FCRA that Plaintiffs allege Experian and Trans Union violated (in contrast to their prior complaints and motion for summary judgment), and discusses disputed accounts that were not specifically mentioned in prior pleadings.   Plaintiffs attached fifty-three tabbed exhibits in support, including an index, but again failed to cite to these documents in their reply memorandum.

Plaintiffs also failed to file proper and timely responses to Experian's and Trans Union's motions for summary judgment.   On November 24, 2004, Experian filed a reply pertaining to its own motion for summary judgment, noting that Plaintiffs did not respond to Experian's motion for summary judgment and requesting that the court rule on its motion as uncontested.   Plaintiffs filed a response to Experian's reply, stating that they did not respond to Experian's and Trans Union's motions for summary judgment "due to the frivolous nature of the motion[s] and all evidence used in support of those motions."   Plaintiffs further stated that because their own motion for summary judgment had been pending before the court for several months, "[t]o simply 'regurgitate' those facts and arguments already set forth by Plaintiffs would have been completely unnecessary."   In short, Plaintiffs maintained that their reply in support of their motion for summary judgment adequately refuted Experian's and Trans Union's evidence.

The court declines to grant summary judgment based solely on Plaintiffs' failure to comply with the technical requirements of the court's local rules.   Plaintiffs' affidavit attached to their motion for summary judgment sets forth numbered statements that the court construes as their statement of facts.   To the extent Plaintiffs' statements in their affidavit are relevant and properly supported with facts that would be admissible in evidence, the court views them in the light most favorable to them.   The court utilized this same approach when searching through Plaintiffs' reply memorandum and exhibits.   Finally, the court construes Plaintiffs' motion for summary judgment and reply memorandum as their response to Trans Union's and Experian's motions for summary judgment.   Material facts Plaintiffs do not controvert are admitted for the purpose of summary judgment.   See D. Kan. R. 56.1(a).   The court, however, assures Plaintiffs that it has reviewed their summary judgment motion, reply memorandum, and attached exhibits to discern the statements of facts that they challenge.

## II.  FACTUAL BACKGROUND

The following facts are taken from the summary judgment record and are either uncontroverted or viewed in a light most favorable to Plaintiffs' case.   Immaterial facts and facts not properly supported by the record are omitted.    When necessary, additional facts are included in the discussion section of this memorandum and order.

### A.  The Whitakers' Allegations Common to All Accounts

The Whitakers requested their credit reports from Experian and Trans Union in August 2002.   While Experian and Trans Union reported several of their accounts in good standing, the Whitakers claim that Experian and Trans Union reported inaccurate information on many accounts

and reported other accounts that were unknown and unrecognizable to them.  As a result, the

Whitakers state that in 2003, they provided Experian and Trans Union documentation supporting

their disputes.  The Whitakers also informed Experian and Trans Union that because several

accounts were inaccurately reported on their credit files, they were exercising their rights under

the Fair Credit Billing Act[3] and withholding payment on the disputed accounts.  The Whitakers

requested that Experian and Trans Union not report the disputed accounts until certain creditors

validated their debts.[4]  The Whitakers allege that Experian and Trans Union failed to comply with

FCRA procedures for dealing with disputed accounts and instead certified the information

reported on their accounts as correct.

     The Whitakers filed the present action on October 30, 2003, alleging that inaccurate

information still remained on their Experian and Trans Union credit files.  The Whitakers request

$75,000 in actual damages from each defendant, as well as $150,000 in punitive damages as a

result of each defendant's willful refusal to delete the disputed, false accounts.  In particular, the

Whitakers claim that the inaccurate reporting by Experian and Trans Union caused them emotional

distress and mental anguish and prevented them from obtaining a refinanced mortgage loan at a

prime rate.

---

[3]     The Fair Credit Billing Act ("FCBA"), 15 U.S.C. § 1666, et seq., provides a procedure
through which a debtor can dispute statements containing a billing error issued by a creditor.  To
trigger the *creditor's obligation* to reinvestigate and verify the billing, the debtor must give
written notice of the specific dispute within sixty days of receipt of the statement.  Id. § 1666(a)
(emphasis added).

[4]     The Whitakers' requests for "validation" meant that they wanted copies of the original
agreement with the creditor and all copies of the statements for the life of the account.

B.  Specific Accounts Disputed by the Whitakers

As an initial matter, the pre-trial order entered on October 6, 2004, indicates that the Whitakers claim that Experian and Trans Union violated the FCRA by reporting inaccurate information on their First National Bank-Omaha, MBNA, Rhodes, Countrywide Home Loan, and Citibank accounts.[5]   The Whitakers also named these five creditors in their original complaint, first amended complaint, second amended complaint, and motion for summary judgment. However, the Whitakers' reply memorandum in support of their motion for summary judgment references, for the first time, alleged inaccuracies on their National City Card Services, First USA, Discover, and GECC/Arrow Financial accounts.   The court holds that these accounts are excluded from consideration in the case due to the Whitakers' failure to include them in the pre-trial order, let alone their three filed complaints.[6]

1.  First National Bank-Omaha Account ("FNB-O")

On November 30, 1998, Susan Whitaker opened a joint credit card account with FNB-O by accepting a pre-approved application sent to "Royal I. Whitaker III" and adding herself as an additional user.   FNB-O assigned the Whitakers account number "4418."   The Whitakers used the FNB-O account extensively over the next few years for purchases and balance transfers.   The

_____

[5]    On November 19, 2004, Magistrate Judge O'Hara granted Plaintiffs' request to file a second amended complaint.   At that time, the court already had entered the pre-trial order and all the parties' motions for summary judgment had been filed.   However, the only significant changes Plaintiffs requested to make to their first amended complaint was to include the specific sections of the FCRA that they alleged Experian and Trans Union violated.

[6]    The pre-trial order entered in this case provides that it "shall supercede all pleadings and control the subsequent course of this case."

Whitakers' account history on the FNB-O account reflects several missed minimum payments and late fees assessed by FNB-O.  In October 2001, FNB-O reduced the credit limit from $14,500 to $10,800 because of the Whitakers' history of late payments and declining credit scores.

The Whitakers' December 2002 statement indicated a balance of $11,961.33 and a minimum payment of $1,161.33.   Royal Whitaker wrote to FNB-O on December 26, 2002 regarding account "4418."   Mr. Whitaker stated that a recent medical emergency had resulted in financial hardship, causing him to review the status of several accounts.   During this review, he stated that he "learned of the extensive use of this account without [his] knowledge."   In particular, he explained that "[a]lthough this account was obtained in my name, I have never used this credit card . . . ."   Nevertheless, Mr. Whitaker requested that FNB-O reduce the minimum monthly payment on the account to $150.00 because he could not afford to continue paying the current amount.   That same day, Mr. Whitaker wrote to Experian and requested that Experian add the following consumer statement to his credit file:  "This account was obtained and used without my knowledge.   A medical emergency has made it difficult to bring acct[.] current.   The problem is being rectified."   FNB-O suspended the Whitakers' purchasing privileges in March 2003. However, FNB-O reinstated the account in April and reduced the Whitakers' monthly payment to $185.00.  The Whitakers did not make a payment on the FNB-O account after April 2003.

On May 1, 2003, Royal Whitaker wrote to FNB-O claiming that account number "2836" "was opened without my knowledge or authorization."   However, he prefaced this statement by stating that he was not refusing to pay on the account.  Mr. Whitaker disputed the balance he owed on the account and requested that FNB-O send him a copy of the original agreement with his

signature and the monthly statements for the life of the account.

On May 27, 2003, Royal Whitaker sent identical letters to Experian and Trans Union concerning FNB-O account number "2836." He asked them to delete the FNB-O account because it "was falsely obtained and used without my knowledge or consent." Mr. Whitaker explained that FNB-O had failed to respond to his request on May 1 to validate his debt. In response to Mr. Whitaker's dispute, Trans Union sent a Consumer Dispute Verification form ("CDV") to FNB-O. FNB-O returned the CDV on June 3, verifying the account as accurately reported by Trans Union. On June 18, Trans Union sent an updated report to Mr. Whitaker concerning FNB-O account "2836." Similarly, Experian sent FNB-O a CDV form, requesting that FNB-O verify all identification information because Mr. Whitaker claimed that the account was fraudulently opened. FNB-O returned the CDV form on June 4, verifying the account information as accurately reported by Experian. Experian informed Royal Whitaker of the results on June 13 and added a fraud security alert to his credit report.

On June 7, 2003, Susan Whitaker sent identical letters to Experian and Trans Union concerning FNB-O account number "2836." She maintained that Experian and Trans Union could not report the FNB-O account until they received debt validation from FNB-O. In response to Mrs. Whitaker's dispute, Trans Union again sent FNB-O a CDV form. FNB-O returned the CDV on June 9, verifying the account as accurately reported by Trans Union. On July 1, Trans Union sent an updated report to Mrs. Whitaker concerning FNB-O account "2836."

On July 10, 2003, Royal Whitaker wrote to FNB-O alleging that it was reporting "extremely derogatory and inaccurate information on my credit files." He also contended that the

9

account number FNB-O reported ("2836") was inaccurate.  Mr. Whitaker confirmed that he had offered FNB-O five thousand dollars "to settle the balance" on the account, but that FNB-O had refused.

On September 3, 2003, Mr. Whitaker wrote to FNB-O demanding proof of the $13,000 debt on FNB-O account number "4418."  He acknowledged receiving from FNB-O a copy of the card agreement "which bears information that I did not right [sic], including a signature of my name."  He further stated:  "I did not open this account.  I have never made charges to this account.  Unauthorized charges were made on this account."  Despite these contentions, Mr. Whitaker offered "to make payments on the difference between the dollar amount of charges my wife has made on this account less the dollar amount of payments she had made on the account" if FNB-O voluntarily removed the derogatory account from all reporting sources.  On September 22, Mr. Whitaker wrote to FNB-O and changed his offer to settle the account.  He informed FNB-O that he was willing to pay the difference between the actual charges and actual payments on the account, which he believed to be $2,500, but that he would not pay any interest fees or other charges.  The Whitakers' FNB-O statement for September 2003 reflected a balance of $12,924.97.

On September 25, 2003, Susan Whitaker wrote a letter to FNB-O, acknowledging FNB-O's counteroffer of $6,500.00 to settle FNB-O account number "4418."  Mrs. Whitaker again alleged that the "account was a result of stolen identity" and requested the bank to "report this as a settled account or accept $50 a month on $2500.00 of interest charges and other fees."  She also asked

FNB-O not to report the account as a charge-off.[7]

On September 29, 2003, the Whitakers wrote identical letters to Experian and Trans Union demanding that they delete FNB-O account "2836" because it was an "invalid, erroneous, inaccurate and unverifiable tradeline." They accused Experian and Trans Union of reporting "unidentified and unknown" FNB-O account number "2836"for at least the past two years. They also acknowledged receiving twelve reports from Experian and Trans Union stating that FNB-O had verified account number "2836" as true and correct. Moreover, the Whitakers contended that accounts "2836" and "4418" were mismerged accounts and asserted that Experian and Trans Union could not lawfully change the account numbers and report the same balance. Finally, the Whitakers maintained that the middle initial "I" shown on their account statements for Mr. Whitaker was incorrect. In response, Trans Union and Experian each initiated an investigation and sent a CDV form to FNB-O. On October 9, FNB-O returned Trans Union's CDV. The CDV verified the identifying information on the Whitakers' account and updated other payment information. Trans Union sent the results of its investigation to Susan Whitaker on October 10 and to Royal Whitaker on October 13. FNB-O returned Experian's CDV on October 7, verifying the identification information on the Whitakers' account and updating other payment information. Experian sent the results of the investigation to Susan Whitaker on October 22.

At some point, FNB-O placed the account in collection. On November 17, 2003, Mr. Whitaker wrote to the collection agency handling the account. He disputed the debt in its entirety,

---

[7]     Companies "charge-off" a bad debt if they do not expect to collect it and are not willing to claim the debt as an asset any longer. The charge-off does not free the debtor from the debt.

contending that he never signed a credit card agreement with FNB-O and that he never made charges or payments on the account. He claimed that he was an "identity theft victim" and demanded copies of the contract and all statements for the life of the account.

2.  MBNA Accounts

a.  Susan Whitaker's Claims

Susan Whitaker opened an MBNA Platinum Access line of credit, account number "749 . . . 5200," and an MBNA Platinum Plus credit card, account number "549 . . . 8367," in her name. She asserts that all monthly statements, phone contacts, and mail correspondence with these accounts referenced those numbers. It is Susan Whitaker's position that Experian and Trans Union reported MBNA account numbers "749 . . . 0136" and "549 . . . 8267" on her credit files and that these MBNA accounts are false, unknown, and unidentifiable.

MBNA originally reported to Experian and Trans Union MBNA account number "749 . . . 5200," the same account number shown on Susan Whitaker's MBNA monthly account statements. Specifically, Susan Whitaker's monthly account statements from March 2000 through October 2002 show MBNA account number "749 . . . 5200." An Experian Consumer File Disclosure dated August 8, 2002 and a Trans Union credit report dated July 17, 2000 reflect this original account number for Susan Whitaker. Mrs. Whitaker's monthly account statements also indicate that MBNA assessed late charges on several monthly statements between May 2000 and September 2002. MBNA charged-off account number "749 . . . 5200 " on September 30, 2002. The October 2002 statement shows a "charge-off adjustment" of $7,310.73 and a zero balance total for MBNA account "749 . . . 5200." Susan Whitaker's credit reports after MBNA charged-

off the account reflect a new account number.  For instance, a Trans Union credit report dated January 7, 2003 and an Experian Consumer File Disclosure dated August 15, 2003 both reported MBNA account number "749 . . . 0136."

MBNA originally reported to Experian and Trans Union MBNA account number "549 . . . 8367," the same account number shown on Susan Whitaker's MBNA monthly account statements.  Specifically, monthly account statements for Susan Whitaker's MBNA Platinum Plus card from January 1999 through May 2002 show account number "549 . . . 8367."  An Experian Consumer File Disclosure dated May 21, 1999 and a Trans Union credit report dated July 17, 2000 reflect this account number for Susan Whitaker.  The monthly account statements also indicate that MBNA assessed late charges on several statements between April 1999 and January 2002.  The May 2002 statement reflects a balance of $13,923.87 with a minimum payment of $ 1,810.00.  MBNA charged-off account number "549 . . . 8367" on May 30, 2002.  The June 2002 statement shows a "charge-off adjustment" of $13,923.87 and a zero balance total for MBNA account "549 . . . 8367."  A subsequent June 2002 statement issued to Susan Whitaker reflects a zero balance for MBNA account "549 . . . 8267."  The purchases and adjustments section of that second June 2002 statement indicates a balance transfer from  "549 . . . 8367."  A Trans Union credit report dated August 15, 2002 and an Experian Consumer File Disclosure dated August 8, 2002 reported MBNA account number "549 . . . 8267."

On April 30, 2003, Susan Whitaker wrote to Experian, Trans Union and CSC Credit regarding several of her accounts, including her two MBNA accounts.  She stated:  "I don't recognize the MBNA accounts being reported on my credit files.  I have 2 MBNA accounts, but

the two you are reporting are inaccurate." She further claimed that the consumer reporting agencies inaccurately reported the dates her accounts were opened. Mrs. Whitaker explained that after her medical emergency, she sent in a settlement offer to clear the balance on both accounts and indicated in her offer that she would consider the balance to be paid in full if the checks were cashed. She asserted that the checks were cashed, but the settlement was not honored. Finally, Mrs. Whitaker mentioned that the MBNA accounts should not be charged off "because the accounts have been in dispute for a long time."

Trans Union received a letter from Susan Whitaker on May 5, 2003, disputing several accounts, including her two MBNA accounts. She claimed that accounts "749 . . . 0136" and "549 . . . 8267" reported incorrect open dates. She further claimed that she paid both accounts shortly before MBNA sent them to collections and that both accounts reflected "incorrect high credits." In response, Trans Union sent a CDV form to MBNA to investigate Mrs. Whitaker's contentions. MBNA returned the CDV form to Trans Union on May 28 and verified the disputed information. Trans Union sent Mrs. Whitaker an updated report on June 2.

On June 7, 2003, Susan Whitaker sent identical letters to Experian and Trans Union, disputing several of her accounts, including her two MBNA accounts. She informed Experian and Trans Union that she asked her creditors to validate her debts, and unless they had received validation from each creditor, they were to delete each disputed account and any relevant inquiries from her credit file immediately. On June 12, Experian responded to Susan Whitaker's letter, stating:

We are responding to your request to verify information appearing on your personal

14

credit report.   The item(s) listed below could not be investigated because you did not tell us specifically why the information is inaccurate.   Please send us detailed reasons why the information is inaccurate, then we will be able to begin our verification process.

Trans Union again sent a CDV form to MBNA, stating that Mrs. Whitaker contended that the MBNA accounts reported inaccurate information, but that she did not provide a specific dispute. MBNA verified the accounts and Trans Union sent Mrs. Whitaker an updated report on July 1.

On June 27, 2003, Susan Whitaker wrote a letter to MBNA.   She disputed the reporting of MBNA account numbers "749 . . . 0136" and "549 . . . 8267."   Mrs. Whitaker stated: "I did have 2 accts. with you but they are not the above referenced accounts.   I disputed the balances of the true accounts and you charged them off instead of validating the debt!"   She requested documents from MBNA that would validate the reported debt.

On July 7, 2003, Susan Whitaker sent identical letters to Experian's and Trans Union's Fraud Victim Assistance Divisions, claiming that Experian and Trans Union were reporting inaccurate information on several fraudulently opened accounts, including MBNA accounts "749 . . . 0136" and "549 . . . 8267."   Mrs. Whitaker claimed that credit was fraudulently obtained in her name beginning in 1997, and since that time, additional accounts continued to be opened regardless of a fraud statement being placed in her credit files.   She specifically mentioned that "a   schizophrenic sister who lived with me for years continued to open fraudulent accounts in my name."   Moreover, she stated that the credit bureaus reported inaccurate "open dates" for several of her accounts.   She claimed that MBNA account "549 . . . 8267" was actually opened in 1997 and MBNA account "749 . . . 0136" was actually opened in 1999.   Mrs. Whitaker asked Trans

Union and Experian to immediately delete both MBNA accounts from her files.   In response, Experian and Trans Union each sent CDV forms to MBNA , informing MBNA that Mrs. Whitaker claimed that both MBNA accounts were fraudulently opened.   MBNA returned the CDV forms and verified that the accounts belonged to Susan Whitaker.

On August 9, 2003, Mrs. Whitaker sent Experian a photocopy of a MBNA monthly account statement for her Platinum Access line of credit, account number "749 . . . 5200," and a photocopy of her MBNA Platinum Plus credit card, account number "549 . . . 8367."   She asked Experian to study both account numbers because its source of verification for these accounts was wrong. Experian responded on August 15, 2003, stating that both MBNA accounts had been previously investigated.   On August 20, Trans Union received a similar letter from Susan Whitaker claiming that the MBNA accounts reported on her Trans Union file were not hers.   Mrs. Whitaker again attached a photocopy of an MBNA account statement and a photocopy of her MBNA Platinum Plus credit card.   Again, Trans Union informed MBNA that Mrs. Whitaker was claiming that the MBNA accounts reported on its files were not hers.   MBNA returned a CDV form to Trans Union verifying the account information as accurate and Trans Union sent Mrs. Whitaker the results on September 18.

Todd Windsor, Subpoena Coordinator for MBNA, confirmed in his affidavit that MBNA charged off account "549 . . . 8367" on May 30, 2002, and account "749 . . . 5200" on September 30, 2002.   He further declared that for accounting purposes, MBNA assigned Susan Whitaker new account numbers after it charged off her accounts.   In particular, he stated that MBNA reassigned account "549 . . . 8367" to "549 . . . 8267" and account number "749 . . . 5200" to "749 . . . 0136",

and subsequently reported these reassigned account numbers to the consumer reporting agencies. He concluded that the reassigned accounts numbers are the same accounts that MBNA assigned to Susan Whitaker prior to charging them off in 2002.   Moreover, Christopher   Mokris, a department manager at MBNA responsible for production operations and support in the speciality collections area, testified in his deposition that it is MBNA's standard practice to assign a new account number once an account is charged off.   He testified that both account numbers are linked, so "[i]t is still the exact same account, but it just has a new account number."

### b.  Royal Whitaker's Claim

The  Whitakers  maintain  that  Royal  Whitaker  never  opened  a  MBNA  account  in  his  name, but that an MBNA account had been erroneously reported on his credit file in March 2002.   To support this, the Whitakers attached a letter dated March 12, 2002, from a representative of MBNA's Credit Bureau Management department.   The letter, addressed to "Royal Whitakeer II" states that in response to his recent request, MBNA asked Experian, Trans Union and Equifax   to delete account number "549 . . . 8367" from his credit reports.   Despite this instruction from MBNA in March 2003, the Whitakers claim that on October 13, 2003, Trans Union reinserted the previously deleted MBNA account "549 . . . 8367" on his credit file.   A Trans Union report dated October 13, 2003 for "Royal Whitaker II" reported MBNA account "549 . . . 8367" on his file.

Steven Reger, a group manager for Trans Union's Consumer Relations and Fraud Victim Assistance Department, provided an affidavit concerning this dispute by the Whitakers.   He stated that the disputed MBNA account never appeared on Royal Whitaker III's Trans Union file.   Rather, the account was always on the file of Royal D. Whitaker, II.   Mr. Reger further contends that Trans

Union never received instructions from MBNA to delete the MBNA account from Royal Whitaker's credit file and, prior to this lawsuit, Royal Whitaker never disputed the reporting of an MBNA account on his file.   Trans Union maintains that the Whitakers produced no evidence showing this account was reported by Trans Union prior to October 2003, thus refuting the argument that Trans Union "reinserted" this account on his file.

### 3. Rhodes

Susan Whitaker testified in her deposition that she opened up a Rhodes account and that "7012" is the correct account number.   On April 30, 2003, Mrs. Whitaker sent a letter to CSC Credit, Trans Union, and Experian disputing several accounts, including her Rhodes account. Specifically, Mrs. Whitaker claimed that Rhodes account number "5360" is inaccurate and that her true account number was "7012."

Prior to June 2003, Trans Union reported account number "7012" on Susan Whitaker's credit file.   On June 2, 2003, Trans Union removed the Rhodes account from Mrs. Whitaker's credit file after Rhodes failed to respond to its CDV within the time period specified by the FCRA.

On June 7, 2003, Susan Whitaker sent a letter to Experian, disputing several accounts, including Rhodes account number "7012."   She informed Experian that she asked her creditors to validate her debts, and unless they had received validation from each creditor, they were to delete each disputed account and any relevant inquiries from her credit file immediately.   On June 12, 2003, Experian responded to Susan Whitaker's letter, stating:

> We are responding to your request to verify information appearing on your personal credit report.   The item(s) listed below could not be investigated because you did not tell us specifically why the information is inaccurate.   Please send us detailed

reasons why the information is inaccurate, then we will be able to begin our verification process.

Experian claims that Mrs. Whitaker never responded to its request, thus preventing it from initiating an investigation. An Experian report dated August 15, 2003 for Susan Whitaker reflects that Rhodes account " 7012" has a balance of $1,168, has two payments 120 days past due, and that the account has been closed at Rhodes's request.

### 4.  Countrywide Home Loans ("Countrywide")

It is not disputed that the Countrywide account at issue belongs to Royal Whitaker III.  Mr. Whitaker, however, disputes the payment history reported for this account.

On December 26, 2002, Royal Whitaker III wrote to Experian requesting that the following consumer statement be placed in his Experian report to explain a late payment on his Countrywide account:

> When this loan was obtained there existed a discrepancy regarding when the . . . [first payment date] should have been.  My records showed December.  The Mtg[.] Co. records showed November.  The Mtg[.] Co. would not change pmt[.] date, therefore my pmt[.] history reflected 30 days past due.  Due to medical emergency I was unable to immediately recover the extra payment.  The problem has since been rectified.

On January 8, 2003, Experian initiated an investigation in response to Mr. Whitaker's request. Experian informed Countrywide of his dispute on the account's status and requested that Countrywide verify all payment history on the Countrywide account.  Countrywide responded by updating the account's history.  That update indicated four payments that were sixty days past due and four payments that were thirty days past due.  Experian sent Royal Whitaker the results of the investigation on January 18.

19

Trans Union received a dispute letter from Mr. Whitaker on January 2, 2003, concerning the Countrywide account's payment history. As a result, Trans Union sent a CDV form to Countrywide, which updated the Countrywide account to reflect a more derogatory status of one payment ninety days late, four payments sixty days late, and four payments thirty days late. Trans Union sent an updated report to Mr. Whitaker on January 15. The next day, Trans Union received an internet dispute from Mr. Whitaker, claiming that the Countrywide account should be reporting only one late payment of thirty days because of a discrepancy in the first payment date. Again, Trans Union sent a CDV form to Countrywide, which verified the payment history as correctly reported. Trans Union mailed an updated report to Mr. Whitaker on January 30. On February 11, 2003, Trans Union received a letter from Mr. Whitaker asking Trans Union to correct his Countrywide account. Mr. Whitaker attached a copy of a correspondence dated February 6, 2003, from Countrywide to Mr. Whitaker, which states that on January 30 Countrywide submitted corrections to the credit reporting agencies regarding the account. The attached Countrywide letter also advised Mr. Whitaker that credit reporting agencies, on average, take two months to complete the submitted corrections.[8] On February 13, Trans Union sent an updated credit report to Mr. Whitaker, reflecting one payment sixty days late and four payments thirty days late.

---

[8]    In support of their claims, the Whitakers attached three additional letters that contain identical language to the February 3, 2003, correspondence between Countrywide and Mr. Whitaker. These three letters are dated March 26, April 10, and June 23, 2003. The letters indicate that Countrywide sent Mr. Whitaker's requested credit corrections to Experian and Trans Union on March 20, April 4, and June 14, respectively. None of the letters, however, identify the specific corrections that Mr. Whitaker requested or that Countrywide submitted.

Mr. Whitaker contacted Trans Union by telephone on March 17, 2003, claiming that his Countrywide account should report no payments sixty or ninety days late, and only two payments that are thirty days late. Trans Union initiated an investigation with Countrywide, which returned a CDV form directing Trans Union to remove the one sixty day late payment. Trans Union mailed the results of the investigation to Mr. Whitaker on April 9, reflecting four payments that were thirty days late.

On May 30, 2003, Experian's files showed that Mr. Whitaker had ten payments that were thirty days past due. On June 9, Mr. Whitaker contacted Experian via telephone and asked Experian to add a consumer statement indicating that the account was only thirty days late once because of a medical emergency. Experian added this statement and sent Mr. Whitaker confirmation the same day.

On June 18, 2003, Countrywide sent a letter responding to a recent telephone conversation in which Mr. Whitaker disputed his account. The letter stated that Countrywide submitted an update to the credit bureaus "to remove the derogatory reporting for the months July through December 2002." The letter further advised Mr. Whitaker that it could take sixty days for the credit reporting agencies to complete the submitted corrections.

Though Mr. Whitaker did not dispute the Countrywide account with Experian again, Experian updated the account on October 9, 2003 to reflect seven payments that were thirty days past due. The report still contained Mr. Whitaker's requested consumer statement that the account was only thirty days late once because of a medical emergency.

The Whitakers filed this action on October 30, 2003. Their original complaint did not

make any allegations concerning the Countrywide account.   Nevertheless, Experian asserts that subsequent communications between the parties revealed that the Whitakers disputed the payment history on the account.   As a result, Experian sent a CDV to Countrywide in December 2003. Countrywide returned the CDV on December 30, updating the account's recent payment history. Countrywide again verified the seven late payments of thirty days reported by Experian.

The Whitakers attached photocopies of checks made out to Countrywide Home to their reply in support of their motion for summary judgment.   The checks reflect the following payment amounts and dates:   $1,572.20 on October 20, 2001; $1,469.55 on November 25, 2001; $1,645.68 on December 26, 2001;[9] $1,645.68 on January 26, 2002;[10] $1,645.68 on February 26, 2002;[11] $1,600.00 on April 3, 2002;[12] $1,608.20 on May 28, 2002; $1,950.00 on June 26, 2002;

---

[9]     Plaintiffs' exhibits demonstrate that this payment is late.   Appearing on the same page of the December 26, 2001 check is a copy of a Countrywide billing statement.   The statement reflects that payment is due on December 1, 2001, and if Mr. Whitaker pays after December 16, 2001, he should enclose a "late payment" of $1,645.00.

[10]     Plaintiffs' exhibits demonstrate that this payment is late.   Appearing on the same page of the January 26, 2002 check is a copy of a Countrywide billing statement.   The statement reflects that payment is due on January 1, 2002, and if Mr. Whitaker pays after January 16, 2002, he should enclose a "late payment" of $1,645.68.

[11]     Plaintiffs' exhibits demonstrate that this payment is late.   Appearing on the same page of the February 26, 2002 check is a copy of a Countrywide billing statement.   The statement reflects that payment is due on February 1, 2002, and if Mr. Whitaker pays after February 16, 2002, he should enclose a "late payment" of $1,645.68.

[12]     Plaintiffs' "detailed record of payment" does not show a payment for March 2002, but Plaintiffs maintain that they never received credit for a $ 1,311.12 payment made for that month. Countrywide sent a letter to Mr. Whitaker on October 2, 2003.   In that letter, Countrywide responded to Mr. Whitaker's dispute that Countrywide failed to apply a payment of $ 1,311.12. Countrywide requested that Mr. Whitaker provide a copy of the check so that it could research the unapplied payment.   Plaintiffs have not produced for the court any evidence to establish the March

$3,300.00 on August 6, 2002;[13] $2,167.76 on September 27, 2002; $2,167.76 on October 28, 2002; $2,167.76 on November 26, 2002; $2,167.76 on December 27, 2002; $2,167.76 on February 3, 2003;[14] $63.20 on March 6, 2003;[15] $1,890.48 on April 29, 2003;[16] $1,842.00 on May 29, 2003;[17] and $1,842.00 on June 26, 2003.

––––––––––––––––––––––

2002 payment either.

[13]    Plaintiffs indicate that the August 6, 2002 check for $3,300 represented two payments. Moreover, Plaintiffs state that they wrote a check to Countrywide on August 30, 2003 for $539.00 after they were informed through correspondence that their August 6 payment was short that amount.   The court also notes that a photocopied Countrywide billing statement appears on the page before the $3,300 check.  While most of the information is scribbled out, the court can discern the following: "Balance due for charges . . . above $ 3,839.12 as of July 17, 2002."

[14]    Plaintiffs' "detailed record of payment" does not show a payment for January 2003, but Plaintiffs maintain that they never received credit for a $1,846.00 payment made for that month. Countrywide sent a letter to Mr. Whitaker on October 2, 2003.   In that letter, Countrywide responded to Mr. Whitaker's dispute that Countrywide failed to apply a payment of $1,846.00. Countrywide requested that Mr. Whitaker provide a copy of the check so that it could research the unapplied payment.   Notably, Plaintiffs have not produced for the court any evidence to establish the January 2003 payment either.  Furthermore, the court observes two notations on the February 3, 2003 check.  Next to the "2,167.76" amount box, the following is handwritten: "1817.00 X 1" and "350.78 *past*" (emphasis added).

[15]    Plaintiffs' "detailed record of payment" claims that in March 2003, they paid Countrwide "over the phone" $1,753.00.   Plaintiffs add that Countrywide informed them that the "March payment should have been $63.20 more, so an additional $63.20 was sent in on the account."

[16]    Plaintiffs' exhibits demonstrate that this payment is late.  Appearing on the page before the April 29, 2003 check for $1,890.48 is a copy of a Countrywide billing statement.  The statement reflects that payment is due on April 1, 2003, and if Mr. Whitaker pays after April 16, 2003, he should enclose a "late payment" of $1,890.48.

[17]    Plaintiffs' exhibits demonstrate that his payment is late.  Appearing on the page before the May 29, 2003 check for $1,842.00 is a copy of a Countrywide billing statement.  The statement reflects that payment is due on May 1, 2003.  The "late payment" amount Mr. Whitaker should pay after May 16, 2003,   is scribbled out.   However, on the bottom of the statement someone wrote "1842.00," the same amount Susan Whitaker paid on the May 29 check.

In June 2003, the Whitakers called Allied Home Mortgage Capital Corporation ("Allied Home"), seeking an extension of credit. In particular, the Whitakers desired to refinance their Countrywide loan at a prime rate. Allied Home ran a credit report to evaluate whether Mr. Whitaker would qualify for a conventional mortgage loan. As a result of a series of late payments on the FNB-O, Countrywide and Citibank accounts, Allied Home informed Mr. Whitaker that it could not locate a lender that would grant him a mortgage loan on the terms he requested. In August 2003, Mr. Whitaker secured refinancing of his home mortgage through a sub-prime lender. Mr. Whitaker claims that this lender required him to pay a higher interest rate than the prime rate he sought from Allied Home, and thus, the inaccurate reporting by Trans Union and Experian injured him financially.

## 5. Citibank

In 1999, Susan Whitaker opened the Citibank account by filling out a pre-approved credit card application under the name "Royal I. Whitaker." Both Mr. and Mrs. Whitaker testified to this fact in their depositions. Account Statements from May 1999 through November 2003 show that the Whitakers used the Citibank account extensively. Moreover, Royal Whitaker's June 1999 statement shows a balance transfer from his individual Capitol One account to the Citibank account at a lower rate.

In August 2002, Trans Union received a letter from the Whitakers requesting that a consumer statement be added to their files stating that medical emergencies caused them to make a series of late payments on their accounts. Trans Union complied with their request.

On December 26, 2002, Royal Whitaker sent Experian a letter requesting that Experian

place a consumer statement on the Citibank account stating: "This account was obtained and used without my knowledge. A medical emergency has made it difficult to bring acct[.] current. The problem is being rectified."[18]   Experian responded, sending Citibank a CDV to investigate Mr. Whitaker's contention that the account was fraudulent. Citibank verified the information on the account as it was reported by Experian. On January 18, 2003, Experian sent Royal Whitaker a Consumer File Disclosure, reflecting that the Citibank account had been updated and that Experian had added a security alert and consumer statement to Mr. Whitaker's file.

Trans Union records show that Mr. Whitaker sent a letter on January 2, 2003, contending that the Citibank account was used without his knowledge. Trans Union sent CDV forms to Citibank. On January 15, Citibank verified the account as belonging to Mr. Whitaker, and Trans Union sent Mr. Whitaker an updated report the same day.

On April 30, 2003, Susan Whitaker sent a letter to Experian and Trans Union disputing several accounts, including the Citibank account. With regard to the Citibank account, Mrs. Whitaker maintained that the account "should only be reporting on my file–[h]owever, I do dispute the balance reporting. I believe that I have paid an excessive amount of money on this account, and the balance does not reflect that."

On May 1, 2003, Royal Whitaker wrote a letter to Citibank concerning his account. He prefaced his letter by stating that he was not refusing to pay the account. However, he claimed that

---

[18]    The Citibank statement for December 2002 reflects a balance over the credit limit of $10,530 and a message from Citibank suspending credit privileges on the account and noting that the account was two months past due.

the "account was opened without my knowledge or authorization" and that he only learned of the account's existence in January or February 2003. He requested that Citibank validate the debt by providing him the original contract with his signature, as well as each monthly statement for the life of the account. Mr. Whitaker claimed that Citibank defamed his character by reporting the Citibank account, which reflected a negative status, on his credit files.

On May 27, 2003, Royal Whitaker sent Trans Union a letter disputing several accounts, including the Citibank account. He contended that the Citibank account "was falsely obtained and used without my knowledge or consent." Mr. Whitaker explained that he asked Citibank to validate the account on May 1, but Citibank failed to respond to his request. Therefore, Mr. Whitaker demanded that Trans Union immediately delete the Citibank account from his credit file. Trans Union initiated an investigation and Citibank instructed Trans Union to delete the Citibank account from Mr. Whitaker's credit file. On June 18, Trans Union sent Mr. Whitaker an updated credit file reflecting that it had deleted the Citibank account.

On June 2, 2003, Citibank sent a letter to Susan Whitaker, stating, in part:

> As a result of our investigation, we have concluded that you opened this account under the name of Royal Whitaker. If you contend that is not the case, then you must call . . . and explain your position regarding this matter. If you do not call and discuss this matter, Citibank will conclude that the findings made during the course of the investigation are correct and continue to maintain that you are responsible for the debt.

Citibank also asked Susan Whitaker to sign an attached restitution agreement setting out repayment terms if she agreed that she was responsible for the debt.

On June 7, 2003, Susan Whitaker wrote identical letters to Experian and Trans Union,

disputing several of her accounts, including her Citibank account.   She informed Experian and Trans Union that she asked her creditors to validate her debts, and unless they had received validation from each creditor, they were to delete each disputed account and any relevant inquiries from her credit file immediately.    On June 12, Experian responded to Susan Whitaker's letter, stating:

> We are responding to your request to verify information appearing on your personal credit report.  The item(s) listed below could not be investigated because you did not tell us specifically why the information is inaccurate.  Please send us detailed reasons why the information is inaccurate, then we will be able to begin our verification process.

In contrast, Trans Union deleted the Citibank account because it concluded that Susan Whitaker was only an authorized user on the account.   Trans Union sent an updated credit report to Susan Whitaker on July 1, 2003.

Citibank's account notes from July 1, 2003, indicate that Susan Whitaker admitted that she opened the Citibank account and that she tried to make a deal to pay off the account for $5,000.00 (the July 2003 Citibank statement reflected a balance over $11,000).   A Citibank representative informed Mrs. Whitaker that the offer would not be accepted, but that a restitution agreement could be put in place to pay off the account.   Susan Whitaker subsequently requested a copy of all the statements from the time the account was opened and a copy of the account application.

Citbank sent Royal Whitaker a letter on July 15, 2003, and informed him that it had determined that he was responsible for the Citibank account because he "received benefit from a balance transfer to a valid account in . . . [his] name at Capital One."   Citibank further stated that it considered the investigation closed.

27

Royal Whitaker again sent Citibank a letter on September 3, 2003, thanking Citibank for the information it provided on his account. Nevertheless, Mr. Whitaker maintained that the information did not validate the reported debt, emphasizing that he did not receive a copy of the credit card agreement. Mr. Whitaker further stated:

> I would be more than happy to discontinue additional correspondence with your company if this debt is removed from my credit file. This account was opened without my consent or knowledge. Unauthorized charges were made. I am the injured part[y] here, not Citibank.
>
> . . . .
>
> I am willing to make payments on the difference between actual charges made by my wife ($21,743.82), and payments that she sent in on the account ($19,373.75). That difference is ($2370.07)[.] I dispute all other fees charged on this account over and above the $21,743.82. The excess fees are usurious.

Mr. Whitaker's Citibank account balance for September 2003 was $11,690.96.

On October 10, 2003, Citibank informed Royal Whitaker that his Citibank account "has been closed due to a fraudulent application in your name." Citibank also stated that it notified the credit reporting agencies to remove the account from Mr. Whitaker's files and that he needed to allow them at least forty-five days to do so. Finally, Citibank requested that Mr. Whitaker provide it with any information he may possess regarding the person who opened the Citibank account.

The Whitaker's original complaint, filed October 30, 2003, did not mention the Cititbank account.[19] Experian states that it learned from subsequent communications with the Whitakers that they disputed the reporting of the Citibank account on Royal Whitaker's credit report. As a result,

---

[19] Plaintiffs filed their first amended complaint on February 26, 2004, which contained allegations regarding the Citibank account.

Experian initiated an investigation into the Citibank account in December 2003 by sending Citibank a CDV.  On December 3,  Citibank returned the CDV and instructed Experian to delete the account.

## IV.  DISCUSSION

Plaintiffs claim that Experian and Trans Union violated their rights under the FCRA. Congress enacted the FCRA "to assure that entities engaged in the business of assembling, evaluating, and disseminating information concerning the personal financial affairs of consumers adopt reasonable procedures to protect the accuracy and confidentiality of such information." Heath v. Credit Bureau of Sheridan, Inc., 618 F.2d 693, 695 (10th Cir. 1980) (citing 15 U.S.C. §§ 1681(a)(4), (b)).  The FCRA creates a private right of action against a consumer reporting agency for the negligent or willful violation of any duty imposed under the Act.  See 15 U.S.C. §§ 1681n, o.

## A.  15 U.S.C. § 1681e(b)

First, Plaintiffs contend that Experian and Trans Union did not follow reasonable procedures to assure the maximum possible accuracy of their credit reports.  Section 607(b) of the FCRA, 15 U.S.C. § 1681e(b), provides that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  A plaintiff must establish four elements to prevail under § 1681e(b):  (1) the consumer report at issue was inaccurate; (2) the consumer reporting agency did not maintain reasonable procedures to assure the consumer report's accuracy; (3) the plaintiff was injured; and (4) the consumer reporting

29

agency's failure to follow reasonable procedures caused the plaintiff's injury.   Cassara v. DAC Servs., Inc., 276 F.3d 1210, 1217 (10th Cir. 2002) (citing Whelan v. Trans Union Credit Reporting Agency, 862 F. Supp. 824, 829 (E.D.N.Y. 1994)).   For the following reasons, the court concludes that Trans Union and Experian reported accurate information on all of Plaintiffs' disputed accounts.   Even assuming the information was inaccurate, the court also concludes that Plaintiffs failed to provide any evidence demonstrating that Trans Union and Experian did not follow reasonable procedures to assure the accuracy of Plaintiffs' accounts.   As a result, the court will not address the final two elements of Plaintiffs' § 1681e(b) claim.

### 1. Accuracy of Credit Reports

As a threshold matter, a consumer must first produce evidence demonstrating that the consumer reporting agency provided a credit report containing inaccurate information.   Ritchie v. TRW, Inc., No. 91-2208, 1992 WL 21300, at *2 (10th Cir. Feb. 3, 1992) (quoting Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1156 (11th Cir. 1991)); see Whelan, 862 F. Supp. at 829 (same).   If this burden is not met, the consumer, as a matter of law, fails to state a cause of action under § 1681e(b), and the court need not evaluate whether the credit reporting agency adopted reasonable procedures to assure the accuracy of its reports.   Id.   "A report is inaccurate when it is 'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to have an adverse' effect."   Dalton v. Capital Associated Indus., 257 F.3d 409, 415 (4th Cir. 2001) (quoting Sepulvado v. CSC Credit Servs., 158 F.3d 890, 895 (5th Cir. 1998) (internal brackets omitted)).   The court will separately address each disputed account.

a. FNB-O

Plaintiffs argue that Experian and Trans Union reported an inaccurate account number and credit limit on their FNB-O account. Specifically, they maintain that Experian and Trans Union inaccurately reported FNB-O account number "2836" with a credit limit of $10,800. Plaintiffs argue that they notified Experian and Trans Union several times that a false, unidentified, and unknown FNB-O account number appeared on their respective credit reports. Plaintiffs state that they opened a joint account with FNB-O in December 1998, that FNB-O provided them with a credit limit of $14,500, and that all written and oral communications, including their monthly FNB-O account statements, reference only account number "4418." Plaintiffs also dispute whether the account should be reported on Mr. Whitaker's file and even maintain that a reasonable investigation would have disclosed the misidentification of Mr. Whitaker as "Royal I. Whitaker" in early 2003. The court concludes that Plaintiffs' arguments are without merit.

Mr. Whitaker's continual claims that the FNB-O account was "fraudulently opened" in his name do not sit well with the court. It is uncontroverted that Mrs. Whitaker possessed the authority to act on her husband's behalf to manage the family's finances. Susan Whitaker testified in her deposition that she normally managed the family's correspondence. Similarly, Royal Whitaker testified in his deposition that Susan Whitaker handled all of the financial and bookeeping matters for the household. With regard to the FNB-O account, Susan Whitaker testified that she filled out a pre-approved acceptance certificate for "Royal I. Whitaker III," signed her husband's name, and added herself as an additional user. Based on this evidence, the court concludes that Plaintiffs are estopped from asserting that the FNB-O account should not have been

reported on Mr. Whitaker's credit files, or that Experian and Trans Union misidentified Mr. Whitaker.

Second, Plaintiffs' contention that the FNB-O account is "unidentifiable," "false," and "unknown" also lacks substance.  It is uncontroverted that FNB-O scrambled the account numbers it provided to credit reporting agencies.  Both Trans Union and Experian submitted into evidence a document demonstrating that FNB-O encrypted account number "4418" to account number "2836."  Finally, Plaintiffs' argument that the credit limit reported by Trans Union and Experian was incorrect finds no support in the record.  It is uncontroverted that FNB-O reduced Plaintiffs' credit limit almost three years before they filed this lawsuit because of Plaintiffs' declining credit scores.  Trans Union's and Experian's credit reports accurately reflect this change.  Plaintiffs have not produced any evidence that Trans Union and Experian inaccurately reported the FNB-O account on Plaintiffs' credit reports, and thus, they are entitled to summary judgment.

### b.  MBNA Accounts

### i.  Susan Whitaker's Claims

Other than the fact that Mrs. Whitaker did not recognize the account numbers being reported by Trans Union and Experian on Susan Whitaker's two MBNA accounts, she has not produced any evidence demonstrating that Experian and Trans Union inaccurately reported the MBNA accounts.  The uncontroverted evidence shows that when MBNA charged off a consumer's account, as a part of its standard practice, MBNA assigned new account numbers to the accounts. The evidence shows that Mrs. Whitaker's "new" account numbers are actually the same accounts that Experian and Trans Union reported both before and after MBNA charged-off the accounts in

2002.

### ii. Mr. Whitaker's Claim

Mr. Whitaker claims that in March 2002, MBNA instructed Trans Union to remove MBNA account "5490" from his credit file.  In October 2003, Mr. Whitaker claims that Trans Union re-inserted the MBNA account on his credit file.  Even assuming the truth of these allegations, the court concludes that this particular claim fails because Mr. Whitaker does not demonstrate that the inclusion of the MBNA account caused him to suffer any injury.  The only denial of credit Plaintiffs allege occurred in June 2003, three months before Trans Union apparently reinserted the MBNA account.  Moreover, Mr. Whitaker's claims of emotional distress are conclusory, at best.

Accordingly, the court concludes that Experian and Trans Union are entitled to summary judgment because Plaintiffs have failed to show that they reported inaccurate information.

### c. Rhodes

Plaintiffs' first amended complaint generally alleged that Rhodes account number "5360" was an unknown account reported on their credit files.  In subsequent paragraphs of the complaint, the Whitakers alleged that CSC Credit reported false a Rhodes account number "5360" and "defendants" failed to remove the false account from their credit files.  Susan Whitaker clarified in her deposition that she was not alleging that Trans Union or Experian reported an inaccurate account number for the Rhodes account.  Rather, she alleged "that Experian and Trans Union are reporting a debt that has not been validated."

Because Susan Whitaker does not allege that Experian or Trans Union reported an

inaccurate Rhodes account number, and Trans Union deleted the Rhodes account in June 2003, the court determines that the only remaining claim is whether Experian unlawfully reported Rhodes account "7012" after Mrs. Whitaker requested it to delete the account until validation was received. Experian's failure to delete the Rhodes account from Mrs. Whitaker's file because she requested validation from Rhodes under the Fair Credit Billing Act does not establish that Experian reported her account inaccurately under the FCRA. As Trans Union correctly points out, the Fair Credit Billing Act places no duties on credit reporting agencies, and it applies to billing errors, not information contained in credit files. 15 U.S.C. § 1666(a).[20] Experian responded to Mrs. Whitaker's April 2003 dispute letter by asking her to detail her objections to its reporting of the Rhodes account. This course of action is expressly authorized by the FCRA. The act provides that a consumer reporting agency may terminate a reinvestigation of a dispute if the consumer fails to provide "sufficient information to investigate the disputed information." 15 U.S.C. § 1681i(a)(3)(A). Plaintiffs provide no evidence that they ever responded to Experian's request, and Plaintiffs' pleadings fail to specify any reporting inaccuracy by Trans Union or Experian regarding the Rhodes account. Accordingly, the court concludes that Experian and Trans Union are entitled to summary judgment.

### d. Countrywide

Experian maintains that the payment history it reported on Mr. Whitaker's Countrywide

---

[20]    To the extent Plaintiffs claim that Trans Union and Experian violated the FCRA because Plaintiffs' creditors failed to validate their debts, the court holds that their argument is without merit.

account accurately reflects the payment history verified by Countrywide when Mr. Whitaker disputed the account.   In particular, Experian cites its Consumer File Disclosure dated October 29, 2003 that reflects seven payments thirty days late and Countrywide's verification of this information on December 30, 2003.   Experian asserts that Plaintiffs have not provided any evidence to prove otherwise.

Similarly, Trans Union maintains that it accurately reported the Countrywide account. Trans Union argues that Plaintiffs have not produced evidence showing the information it reported was inaccurate, or for that matter, established that Mr. Whitaker paid the Countrywide account on time.   Lastly, Trans Union points out that Mr. Whitaker testified in his deposition that he did not know if he was ever thirty days late in paying his Countrywide account because he did not pay the bills for his household.

The court concludes that Plaintiffs have not provided any evidence showing that Experian or Trans Union inaccurately reported the payment history on Mr. Whitaker's Countrywide account. Plaintiffs have not indicated which months should not be reported as late payments on their credit files.   The only evidence provided by Plaintiffs was photocopies of checks Susan Whitaker wrote to Countrywide from October 2001 to June 2003.   The court's own review of the Countrywide billing statements and the checks sent to Countrywide establishes that Susan Whitaker made several payments to Countrywide after the "late payment" date.   Moreover, Plaintiffs failed to produce to the court evidence of payments in March 2002 and January 2003.   Indeed, Countrywide's October 2003 letter to Mr. Whitaker requested copies of checks to prove payments for those for those months.   Plaintiffs did provide four letters from Countrywide, dated March,

April, June, and October 2003, indicating that Countrywide had sent to the credit reporting agencies Mr. Whitaker's requested corrections. However, these letters do not specify what those requested corrections are. The uncontroverted evidence establishes that Experian and Trans Union updated Mr. Whitaker's payment history every time they received a dispute regarding the account or when Countrywide instructed them to change the status on the account. Experian's most recent report reflects seven payments on the account that are thirty days past due and Plaintiffs do not show otherwise. Accordingly, Experian and Trans Union are entitled to summary judgment because Plaintiffs have failed to create a genuine issue of material fact concerning the accuracy of their payment history on the Countrywide account.

### e. Citibank

Plaintiffs argue that Trans Union and Experian erroneously reported the Citibank account on Mr. Whitaker's files and failed to promptly delete the account after being instructed by Citibank to do so.

Per Citibank's instruction, Trans Union deleted the Citibank account on Mr. Whitaker's credit file in June 2003 (and Mrs. Whitaker's in July 2003), and Experian deleted the Citibank account on Mr. Whitaker's file in December 2003. Initially, Citibank conducted its own investigation of Plaintiffs' disputes and concluded that Mrs. Whitaker opened the Citibank account and that Mr. Whitaker was responsible for the account because he received a beneficial balance transfer from his Capitol One account. For some reason not evidenced in the record, Citibank eventually changed its position, concluded that the account was fraudulently opened, and closed the account. Citibank also requested that Mr. Whitaker provide it with any information on who

may have fraudulently opened the account.

The court concludes that Plaintiffs are estopped from asserting that Trans Union or Experian erroneously reported the Citibank account on Mr. Whitaker's file.  The evidence shows that as with the FNB-O account, Mrs. Whitaker opened up the Citibank account by filling out a pre-approved certificate in Mr. Whitaker's name, and proceeded to use the account on a regular basis. In sum, the record establishes that Mrs. Whitaker controlled all of the family's financial affairs and that Mr. Whitaker continually permitted his wife to act on his behalf in that regard.  Moreover, the evidence demonstrates that Experian and Trans Union each properly verified the information reported by Citibank up to the time they deleted the account.  As Experian and Trans Union observed, Plaintiffs have no right to complain that Citibank reported the account under Royal Whitaker's name under these circumstances.  Accordingly, the court concludes that Trans Union and Experian are entitled to summary judgment.

### 2. Reasonableness of Procedures

Even assuming Trans Union and Experian reported inaccurate information, Plaintiffs do not provide a shred of evidence that Trans Union and Experian failed to follow reasonable procedures to assure the maximum possible of accuracy of their credit files.  Instead, Plaintiffs maintain that Trans Union and Experian did not follow reasonable procedures because they relied solely on the inaccurate information verified by Plaintiffs' creditors.  Plaintiffs contend that the law required Trans Union and Experian to do more.  For this proposition, Plaintiffs cite the Sixth Circuit's decision in Bryant v. TRW, Inc., 689 F.2d 72 (6th Cir. 1982).

In Bryant v. TRW, Inc., the defendant credit reporting agency appealed a jury verdict that

the defendant violated § 1681e(b) by providing inaccurate information to a mortgage company, causing the plaintiff to be denied on his home loan application. Id. at 74. The defendant maintained that it could not be liable under § 1681e(b) for accurately reporting the information provided by the plaintiff's creditors. The Sixth Circuit disagreed, holding that "a consumer reporting agency does not *necessarily* comply with . . . [§ 1681e(b)] by simply reporting in an accurate manner the information it receives from creditors." Id. at 78 (emphasis in original). The Sixth Circuit further observed that decisions involving § 1681e(b) must be decided on a case-by-case basis and that "liability does not flow automatically from the fact that a credit reporting agency . . . reports inaccurate information." Id. Instead, the Sixth Circuit concluded that liability depends on a credit reporting agency's failure to follow reasonable procedures to assure maximum possible accuracy of the consumer's credit information. Id. Based on the plaintiff's previous contacts with the defendant, the court determined that the defendant should have asked the plaintiff's creditors to investigate and reevaluate his complaints, rather than make two phone calls to confirm the creditor's information. Id. at 78-79.

Plaintiffs' citation to Bryant does not save their § 1681e(b) claim. As Bryant makes clear, § 1681e(b) cases must be decided on a case-by-case basis, and a credit reporting agency is not strictly liable for reporting inaccurate information. In contrast to the Bryant defendant, Trans Union and Experian repeatedly responded to Plaintiffs' disputes by sending CDV forms to their creditors. There is no evidence to suggest that the CDV procedure employed by Trans Union and Experian was not a reasonable method to assure the accuracy of Plaintiffs' credit files. See Lee v. Experian Info. Solutions, No. 02 C 8424, 2003 WL 22287351, at *6 (N.D. Ill. Oct. 1, 2003)

(citation omitted) ("Quite understandably in light of the staggering amount of credit that fuels our economy and the enormous burden (and hence cost) that a general requirement of more detailed follow-up procedures would impose on the system, the CDV procedure alone is accepted by courts as an adequate method both for assuring accuracy and for reinvestigation . . . .).   Indeed, Plaintiffs' own conduct regarding the FNB-O and Citibank accounts prevents any good faith argument to the contrary.   Moreover, as Experian's expert report noted, identify fraud cases are difficult to detect "[w]hen an individual family member steals the identity of other family members and opens accounts using this stolen identification . . . ."

### B.  15 U.S.C. § 1681i(a)

Plaintiffs next claim that Experian and Trans Union violated 15 U.S.C. § 1681i(a) , which sets forth procedural steps that a consumer reporting agency must follow when a consumer makes a dispute.   Specifically, if a consumer contacts a consumer reporting agency to dispute the completeness or accuracy of the information contained in the consumer's file, the agency must conduct a reasonable investigation to discern whether the disputed information is inaccurate.   15 U.S.C. § 1681i(a)(1)(A).   As part of its investigation, the consumer reporting agency must promptly give notice of the dispute and all relevant information regarding the dispute to any person who furnished the disputed information to the consumer reporting agency.   Id. § 1681i(a)(2).   The FCRA further authorizes a consumer reporting agency to terminate the investigation if it reasonably determines that the consumer's dispute is frivolous or irrelevant.   Id. § 1681i(a)(3). The credit reporting agency may also terminate the investigation if the consumer fails to provide sufficient information to investigate.   Id.   A consumer reporting agency that determines that the

disputed information is inaccurate, incomplete, or unverifiable must delete the information or modify the information based on the results. Id. § 1681i(a)(5)(A)(i). In those circumstances, the consumer reporting agency must then notify the furnisher of information about the deletion or modification. Id. § 1681i(a)(5)(A)(ii). The consumer reporting agency must also provide the consumer notice of the results. Id. § 1681i(a)(6).

To prove a claim for failure to reinvestigate under § 1681(a), Plaintiffs must show: (1) a consumer reporting agency reported inaccurate or incomplete information in their credit file; (2) Plaintiffs directly notified the consumer reporting agency of the inaccurate or incomplete information; (3) Plaintiffs' dispute with the consumer reporting agency was not frivolous or irrelevant; (3) the consumer reporting agency did not respond to Plaintiffs' dispute; (5) the consumer reporting agency's failure to reinvestigate caused Plaintiffs to suffer damages; and (6) Plaintiffs incurred actual damages, which may include mental anguish and injury to reputation and credit worthiness. Thomas v. Trans Union LLC, 197 F. Supp. 2d 1233, 1236 (D. Or. 2002) (citations omitted).

Experian argues that Plaintiffs cannot succeed on their § 1681i(a) claim because Experian reported accurate information in Plaintiffs' files, Plaintiffs' disputes were frivolous or irrelevant, and Plaintiffs have not proved that Experian caused them damage by a failure to reinvestigate one of their accounts. Experian maintains that every time Plaintiffs disputed an account, it sent out a CDV form to the creditor. In each case, Experian asserts, the creditors either verified the reported information or asked Experian to make minor changes or deletions that Experian promptly complied with. Furthermore, Experian argues that it failed to reinvestigate an account only when:

40

Experian could not find the account under the number provided by Plaintiffs; the account was not located in Plaintiffs' files; Plaintiffs did not provide a detailed basis for their dispute; or Experian had reinvestigated the account recently based on the same dispute.

Likewise, Trans Union contends that Plaintiffs' § 1681i(a) claim fails because: Trans Union reported accurate information on Plaintiffs' credit files; Trans Union responded to and reinvestigated each dispute made by Plaintiffs and subsequently updated or removed the account according to the creditors' instructions; and Plaintiffs have failed to prove actual damages or show that Trans Union's failure to conduct a reinvestigation caused them to suffer any damages.

Plaintiffs' reply memorandum states that "[i]n order to prove the credit reporting agencies['] liability under [§]1681i(a), Plaintiffs must show that they disputed items in their file and that any reinvestigation conducted by the credit reporting agencies did not resolve the dispute." This is not an accurate statement of the law. See e.g., § 1681i(b) (providing that a consumer may file a statement setting forth the nature of the dispute if the consumer reporting agency's reinvestigation does not resolve the dispute). In any event, Plaintiffs do not satisfy the first element of their claim because the court has already determined under their § 1681e(b) claim that the information Trans Union and Experian reported was accurate. Furthermore, other than simply stating that Trans Union and Experian did not adequately and reasonably reinvestigate their disputes under the FCRA, Plaintiffs cite to nothing in the record to establish that Trans Union's or Experian's reinvestigations did not satisfy § 1681i(a)'s requirements. Accordingly, Trans Union and Experian are entitled to summary judgment on this claim.

41

### C.  15 U.S.C. § 1681s-2(b)

Plaintiffs next claim that Defendants violated 15 U.S.C. § 1681s-2(b).  This section outlines the investigative procedure that "furnishers of information" must follow after a consumer reporting agency provides the "furnisher of information" notice, pursuant to § 1681i(a)(2), of a consumer's dispute concerning the completeness or accuracy of information contained in the consumer's credit file.  This section provides duties to "furnishiers of information," not consumer reporting agencies.  Accordingly, Trans Union's and Experian's motions for summary judgment are granted because they may not be held liable under § 1681s-2(b) of the FCRA.  See Aklagi v. Nationscredit Fin. Servs. Corp., 196 F. Supp. 2d 1186, 1192 (D. Kan. 2002) (noting that the FCRA establishes separate obligations for consumer reporting agencies, users of consumer reports, and furnishers of information to consumer reporting agencies, and that § 1681s-2 governs the latter).

### D.  15 U.S.C. § 1681g

Finally, Plaintiffs claim that Trans Union and Experian violated section 609 of the FCRA, codified as 15 U.S.C. § 1681g.  That section outlines a consumer reporting agency's disclosure requirements with respect to consumers.  In general, a consumer reporting agency must, upon request, "clearly and accurately" disclose:  all information in the consumer's file; the source of the information; the names of persons that received a copy of the consumer's report within a specified time period; the dates, amounts and original payees of checks that generate an adverse characterization of the consumer; an account of all inquiries the consumer reporting agency received within a specified time period that identified the consumer in relation to credit or insurance transactions and were not initiated by the consumer; and if the consumer only requests

a credit file, a statement that the consumer may request and obtain a credit score.  Id. § 1681g(a).

As to this claim, Plaintiffs' reply brief in support of their motion for summary judgment states:

> Every consumer agency shall clearly and accurately disclose the nature and substance of all information in its files on the consumer.  The consumer reporting agency must have trained personnel to explain to the consumer any information furnished in accordance with the [A]ct.  Particularly when the file includes coded information that would be meaningless to the consumer, the agencies['] personnel must assist the consumer to understand the disclosures.  Any summary must not mischaracterize the nature of any item of information in the file.
>
> . . .
>
> A consumer reporting agency may allow consumers to choose truncation or other security measures in their own file disclosure, however a credit reporting agency that always scrambles or truncates account numbers does not technically comply with Section 609 because it does not provide . . . accurate [and clear] . . . disclosure of "all information" in the file. (FTC commentary)[.][21]

Plaintiffs do not claim that Trans Union or Experian failed to provide information upon their request.  Rather, Plaintiffs appear to claim that Defendants did not "clearly and accurately" disclose "all information" on their credit files because account numbers on their credit files were scrambled or truncated.  In support, Plaintiffs attached a Federal Trade Commission ("FTC") informal staff opinion letter, dated June 30, 2000.  The letter addresses whether a consumer

---

[21]     Section 1681h(c) of the FCRA is apparently the source of Plaintiffs' assertion that "[t]he consumer reporting agency must have trained personnel to explain to the consumer any information furnished in accordance with the [A]ct."  That section states: "Any consumer reporting agency shall provide trained personnel to explain to the consumer any information furnished to him pursuant to section 609 [15 U.S.C. § 1681g].  To the extent Plaintiffs attempt to state a claim under § 1681h, they are not successful.  Plaintiffs have not produced any evidence showing that Trans Union or Experian failed to provide trained personnel to explain the information contained in their credit files.

reporting agency may "for security purposes, . . . 'truncate, scramble or mask the account number and social security number' when making file disclosures to consumers." FTC Informal Staff Opinion Letter, Denise A. Darcy, June 30, 2000. Trans Union requested the opinion because a consumer recommended such a procedure after someone fraudulently procured the individual's Trans Union file. Id. Trans Union stated: "'While some creditors truncate or scramble the data before they supply it to us, not all do; therefore, many of the account numbers on our file are complete and accurate, and that is what we disclose to the consumer.'" Id. The opinion letter concluded that "a credit reporting agency that always scrambles or truncates account (or social security) numbers does not technically comply with Section 609 because it does not provide 'accurate' (and perhaps not 'clear') disclosure of 'all information' in the file." Id. To avoid noncompliance, the letter recommended that a consumer reporting agency give consumers the option, when requesting a credit file disclosure, to truncate or scramble some of the items in their file. Id.

It is not necessary for the court to discuss what level of deference is proper to give the informal opinion letter. The informal opinion letter is not applicable to this case. The informal opinion letter specifically addresses the situation where a creditor reports the actual account number to the credit reporting agency and the credit reporting agency scrambles the account number when it reports the account to the consumer. Here, it is uncontroverted that FNB-O scrambled Plaintiffs' account number when it reported the account to Trans Union and Experian. This is not a situation where Trans Union or Experian scrambled an account number on its own initiative and then failed to disclose the true account number upon a consumer's request.

Second, the court determines that, as a matter of law, scrambling or truncating a consumer's account number is a reasonable procedure to protect the consumer's information from potential identity theft.  The possibility of holding a credit reporting agency liable for reporting a scrambled or truncated account number that a creditor furnished would lead to absurd results, especially if the credit reporting agency did not know that the creditor furnished it with such an account number. Accordingly, the court concludes that under the facts of this case, Trans Union and Experian did not violate § 1681g by reporting scrambled or truncated account numbers in Plaintiffs' credit files.

IT IS, THEREFORE, BY THE COURT ORDERED that Trans Union's motion for summary judgment (Doc. 193) and Experian's motion for summary judgment (Doc. 188) are granted. Plaintiffs' motion for summary judgment (Doc. 67) is denied as moot.

Copies of this order shall be transmitted to *pro se* Plaintiffs and counsel of record.

The case is closed.

**IT IS SO ORDERED.**

Dated at Kansas City, Kansas, this 3rd day of February 2005.


/s/ G.T. VanBebber
G. Thomas VanBebber
United States Senior District Judge

45